Cite as 2025 Ark. App. 379

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-25-59

| | |
|---|---|
| BONNEY HUGGLER AND DAVID DUNCOMBE<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | Opinion Delivered June 4, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION<br>[NO. 60JV-22-953]<br><br>HONORABLE SHANICE JOHNSON, JUDGE<br><br>AFFIRMED |

**CINDY GRACE THYER, Judge**

Bonney Huggler and David Duncombe separately appeal the Pulaski County Circuit Court's order terminating their parental rights to their daughter, three-year-old MC. Huggler argues that there was insufficient evidence to support termination because there were other less restrictive options available and because there was no evidence she posed a risk of harm to her child. Duncombe argues that it was erroneous to terminate his parental rights when there was testimony that the child should continue contact with her birth relatives. We find no error and affirm.

I. *Factual Background and Procedural History*

In November 2022, police officers discovered then seventeen-month-old MC alone in a car. Bonney Huggler (MC's mother) appeared twenty minutes later and told officers that

she had left MC in the car in front of her friend's house while she went to get gas. The house where she parked her car was abandoned, however, and the closest gas station was at least a ten-minute walk away. Huggler did not have money and had been unable to purchase the gas. She also claimed to be unaware that her friend no longer lived at that location. The police searched her and discovered marijuana and a glass pipe. Marijuana was also found in a diaper bag sitting next to MC in the vehicle, but Huggler denied any knowledge of the marijuana in the diaper bag. She was arrested for possession of drug paraphernalia and endangering the welfare of a minor.

After Huggler's arrest, a report was made to the Arkansas Department of Human Services (Department), and a seventy-two-hour hold was placed on the child due to the Department's determination that Huggler had not provided the supervision necessary to protect MC from potentially dangerous harm. The Department noted that Huggler had left MC unattended in a vehicle in front of an abandoned home and that, while in the car, MC had access to the marijuana from the diaper bag and could have easily ingested the drug while she was unattended. Additionally, John Huggler (MC's grandfather) informed the Department that this was not the first time Huggler had left MC unattended in a vehicle.

A petition for ex parte emergency custody and dependency-neglect was filed on November 29, 2022, and listed David Duncombe as MC's father. An ex parte order was

granted that same day.[1] That petition was later amended to change Duncombe's party status to that of putative father. On December 6, 2022, the court found probable cause to believe MC was dependent-neglected and that custody should remain with the Department.

An adjudication hearing was held on January 25, 2023. The circuit court found MC dependent-neglected and at substantial risk of serious harm due to Huggler's neglect and parental unfitness. Duncombe, however, was not found to have contributed to the dependency-neglect finding or the cause of removal. The adjudication order reflected that the Department maintained custody of MC but that Huggler's father, John Huggler, was MC's foster parent at that time.

A review hearing was held on April 3, 2023. After the hearing, the court entered an order finding that MC should remain in the Department's custody due to safety concerns—the existence of a no-contact order and the fact that both parents had been arrested for drugs. The goal of the case was set as reunification with Huggler with a concurrent goal of guardianship with a fit and willing relative. As for the Department, the court found that although it had more than partially—but less than substantially—complied with the case plan,[2]

---

[1]The ex parte order ordered the parents, in part, to submit a list of MC's adult relatives. Huggler complied with the order and provided a list that included her father and MC's maternal great aunt and uncle who later fostered MC.

[2]The court found that the Department had failed to timely submit MC's referrals and the court report and had provided insufficient information for notifying relatives about the case.

it had made reasonable efforts to provide family services and to finalize a permanency plan for MC.

As for Huggler, the court found that she also had "more than partially, but less than substantially" complied with the case plan and orders of the court. Specifically, Huggler had completed the hair-shaft test and had completed some parenting classes, although the exact number of classes completed was unclear. The court noted that her referral to counseling had been submitted but not yet commenced.

As for Duncombe, the court found that he had failed to comply with the case plan or orders of the court. Duncombe had not yet provided his contact information to the Department and had not yet resolved the issue of paternity.[3]

Another review hearing was held on June 7, 2023. The goal of the case remained reunification with Huggler with a concurrent goal of guardianship with a fit and willing relative. The court found that Huggler needed to complete services and expressed concern about her inability to produce a valid sample for a drug screen that day. The court further expressed unease about her continued relationship with Duncombe amid concerns of domestic violence in the home. The court found that Duncombe had failed to comply with any of the court's orders and had not participated in the case since adjudication.

A third review hearing was held on July 26, 2023. Again, MC was ordered to remain in the custody of the Department because of Huggler's lack of progress in the case. The court

---

[3]There was conflicting information as to whether Duncombe had submitted the results of his paternity testing.

found that the Department had substantially complied with the case plan, while Huggler and Duncombe had only partially complied with the plan. The court noted that Huggler's truthfulness had been an issue since the beginning of the case and that the no-contact order between Huggler and Duncombe had been repeatedly violated. The court was further concerned with Huggler's decision-making process. The court noted that while Huggler was engaged in domestic-violence counseling and parenting classes, she had not benefited from either as her visitation had been inconsistent, and she had attempted to bring Duncombe to visitation while no-contact orders remained in place.

As to Duncombe, the court noted that MC could not be placed with him because there was still a no-contact order in place prohibiting his contact with MC. As for his compliance, Duncombe had started parenting classes and completed the DNA testing, but his hair-shaft drug screen was positive for amphetamines and THC, and he attempted visitation despite the no-contact orders.

The goal of the case remained reunification with Huggler with a concurrent goal of guardianship with a fit and willing relative. The order further stated that John Huggler continued to be an approved relative foster parent.

A permanency-planning hearing was conducted over four days on October 17 and December 8, 2023;[4] and January 11 and 24, 2024.[5] The DNA results submitted at the beginning of the hearing in October established that Duncombe is MC's parent.[6] The court, in the permanency-planning order, outlined the history of the proceedings and concluded MC could not be returned to either parent. As such, the court continued legal custody of MC with the Department and changed the goal to guardianship with a fit and willing relative with a concurrent goal of adoption. The court stated that it had safety concerns related to Huggler since it did not believe she had benefited from the services she had completed. The court stated further that it had ongoing concerns regarding Huggler's judgment and her continued prioritization of her relationship with Duncombe versus getting her child out of Departmental custody. The court noted that there had been a history of domestic violence and the violation of no-contact orders, with Duncombe claiming that Huggler was the aggressor in these incidents. Regardless, the court was most concerned about a recent incident in which Huggler was driving a vehicle in an unsafe manner, and Duncombe kicked out a window. As to Duncombe, the court noted that he still has a substance-abuse problem

---

[4]The hearing was continued in December due to Duncombe's assertion that the case had not been appropriately staffed as ordered by the court.

[5]The permanency-planning order incorrectly lists the January dates in 2023 instead of 2024.

[6]The dependency-neglect petition was updated on December 8, 2023, to reflect Duncombe's status as legal father.

and that, despite his disclosure that Huggler is the aggressor in their domestic-violence incidents, he continued to prioritize their unhealthy relationship.

Under these circumstances, the court found that both parents had "more than partially, but less than substantially" complied with the case plan and court orders.

A fourth review hearing was held on March 13, 2024. After hearing the evidence, the court continued custody with the Department but provided that the parties could agree to a trial home placement with Huggler after staffing and creation of a safety plan; however, no such placement was available for Duncombe because he was incarcerated, and the no-contact order remained in place. The court continued the goal of the case as guardianship with a fit and willing relative with concurrent goals of reunification or adoption. The court found that the Department had substantially complied with the case plan and had made reasonable efforts to provide services and finalize a permanency plan for MC. It found that Huggler had substantially complied with the case plan and orders of the court by continuing individual therapy services and completing parenting classes. The court clarified that, while Huggler had made progress toward alleviating or mitigating the causes of removal, it remained to be seen whether she had benefited fully from those services. As for Duncombe, the court found that he had more than minimally but less than partially complied with the case plan and orders of the court. The court noted that he had been working on his anxiety issues and had attended some counseling visits despite his incarceration. Even so, the court found that he had made no progress toward alleviating or mitigating the issues that prevent the placement of MC in his home.

A final review hearing was held on May 22, 2024. At the hearing, the court ordered a trial home placement with Huggler to begin on May 24. The court cautioned that Huggler needed to demonstrate that she could put MC's needs first: there was period of time in which Huggler was sneaking Duncombe into the home and then denying it. MC could not be placed with Duncombe because he was incarcerated, needed a new drug-and-alcohol assessment, and needed to be involved in therapy. The court also noted the presence of MC's maternal grandfather, John Huggler, at the hearing, but found that MC was well adjusted in her current placement with "Mrs. Tish and Mr. Sam," MC's maternal great aunt and uncle.

On July 17, 2024, the Department and the attorney ad litem filed a joint petition for termination of parental rights alleging that termination was in MC's best interest. The petition asserted the following statutory grounds as to Huggler: twelve months' failure to remedy; subsequent other factors; and aggravated circumstances—little likelihood of successful reunification, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, (vii)*(a)* & (ix)*(a)(3)(A)* (Supp. 2023); and as to Duncombe: twelve months' failure to remedy by noncustodial parent; subsequent other factors; and aggravated circumstances—little likelihood of successful reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(b)*, (vii)*(a)* & (ix)*(a)(3)(A)*.

In the petition, the Department alleged that Huggler had advocated for Duncombe to visit with MC at the family team meeting on June 18 despite acknowledging that Duncombe had been civilly committed for seven days due to his mental health. Huggler also asked for assistance in getting the no-contact order modified. The Department also alleged that only five days after the meeting, a family service worker discovered Duncombe at

Huggler's home during a surprise home visit. This incident resulted in the termination of Huggler's trial placement. Huggler denied a continued relationship with Duncombe and claimed he had been holding her hostage at the time of the surprise visit. The petition acknowledged her claims but highlighted Huggler's failure to ask for help from the family service worker at the time, her attempts to conceal Duncombe's presence in the home, her leaving MC with him while she went outside to speak to the family service worker, and her return to the home with him after MC was removed from her care. The Department noted that her continued interactions with Duncombe were problematic: Duncombe had not yet started his individual counseling or anger-management classes; he had continued his relationship with Huggler despite a no-contact order being in place and his arrest in November 2023 for domestic battery against Huggler; and he had threatened to attack Huggler with spray paint and to "burn the whole goddamn town down" if MC was not returned to him.

The termination hearing was held on September 18, 2024. Huggler was present at the hearing, as were MC's maternal great aunt and uncle—the foster parents—and MC's grandfather. Duncombe did not attend but was represented by counsel at the hearing.

Andrea Williams, the family service worker, testified regarding the history of the case, including the services provided to each parent and Huggler's recent positive THC drug screen. She also testified regarding the problematic relationship between Huggler and Duncombe, including the domestic-violence issues, the violations of their no-contact orders, and the termination of the trial placement due to Duncombe's presence in the home.

9

Regarding the latter, she testified that Huggler came outside to her car to meet her; that Huggler left MC in the home alone with Duncombe when she did so; that Huggler appeared irritated when Duncombe stepped outside and made his presence known; and that Huggler told her that Duncombe was there only because he wished to see MC. Huggler did not inform Williams that she was being held hostage and returned to the home with Duncombe when Williams left with MC. It was only later that Huggler claimed to have been held hostage by Duncombe. Despite her claim that she had been held hostage and her subsequent report to the prosecuting attorney's office, Huggler still inquired into whether the Department could supervise visits between MC and Duncombe. Williams claimed that, while Huggler appeared to understand and wanted to rectify the issues preventing placement, Huggler's issues with dishonesty and the Department's concerns regarding domestic violence prevented reunification. As for Duncombe, she testified that he had been incarcerated off and on for extensive periods of time during the proceedings and that his continued drug use, undiagnosed mental-health problems, and domestic-violence issues were concerns of the Department.

As for relative placement options, Williams testified that MC's grandfather and her great aunt and uncle had been very present throughout the case and that they were adamant about wanting to maintain contact with MC. Neither was an option for placement, however. She stated that, in the beginning, the grandfather had wanted to be a placement option, but he had since withdrawn his request. The great aunt and uncle had stated they could not be a long-term full-time placement option for MC because of MC's age and their medical

10

concerns. Neither the grandfather nor the great aunt and uncle testified that they wished to be considered as a placement option, nor did they intervene in the matter.

Mary Glenn, the adoption specialist, testified that MC is adoptable and that 125 available adoptive families matched MC's criteria. On cross-examination, Glenn stated that her search included a "needs to maintain contact with a birth relative" option.

Taylor Burks, a family advocate, testified that she had been working with Huggler concerning her domestic-violence issues and that they had put in place a safety plan for Huggler when dealing with Duncombe.

Huggler then testified on her own behalf. She testified that she was no longer in a relationship with Duncombe and that, during the surprise home visit, she was just implementing the safety plan; that is, to placate Duncombe until she could seek assistance. She stated that she asked for supervised visitation between Duncombe and MC only because she was afraid the no-contact order would be lifted, and she would be left dealing with him herself. She acknowledged her mistakes throughout the history of the case and highlighted the positive changes she had made.

At the close of the evidence, the Department and the ad litem asked that Huggler's and Duncombe's parental rights be terminated. Huggler's counsel argued that Huggler's parental rights should not be terminated. She argued that the adoption specialist had stated that MC needed to maintain contact with a birth relative and that her mother, Huggler, was the closest birth relative. She further argued that Huggler should be given more time because

11

Huggler was the "best fit" for the child. Duncombe's attorney presented no argument in his defense.

After the hearing, the court terminated the parental rights of both parents, finding that the Department had proved all grounds specified in the termination petition and that termination was in MC's best interest. From the bench, the court noted that "[t]here's no relative to seek at this point, so not terminating parental rights would . . . require her to remain in foster care and languish."

Huggler and Duncombe separately appealed the termination of their parental rights.

II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Hall v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 4. An order forever terminating parental rights must be based on a finding by clear and convincing evidence that termination is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). The circuit court must consider the likelihood that the child will be adopted if the parents' rights are terminated and the potential harm that could be caused if the child is returned to the parent. *Id.* The circuit court must also find clear and convincing evidence of one or more grounds for termination. *Id.*

When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the circuit court's finding is clearly erroneous. *McGaugh v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 485, 505 S.W.3d 227. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the

12

clearly erroneous question, we defer to the circuit court because of its superior opportunity to observe the parties and judge the credibility of the witnesses. *Id.*

III. *Analysis*

Neither Huggler nor Duncombe explicitly challenge the court's statutory grounds for termination in their opening briefs. Instead, both argue that termination was not in MC's best interest since there was a less restrictive placement option—relative placement. Their arguments will be addressed in turn.

A. Huggler

Huggler argues on appeal that termination was not necessary to achieve permanency for MC. She claims that, because the evidence showed that maintaining contact with birth relatives postadoption was part of the plan related to MC's adoption, there was no evidence that MC could not remain in the custody of birth relatives as she had throughout the pendency of the case while she worked toward reunification. As such, placement with family was a consideration and was clearly a less restrictive option than termination. Furthermore, she contends there was no harm in leaving MC in the custody and care of her family members, thereby allowing her more time to continue to improve her circumstances.

Huggler, however, did not make this argument below. That is, she never argued to the circuit court that termination was not in MC's best interest because there was a less restrictive alternative available. She only sought to have the termination held in abeyance and that she be given more time. The failure to raise a challenge or obtain a ruling below is fatal to the appellate court's consideration of an issue on appeal. *Alexander v. Ark. Dep't of*

13

*Hum. Servs.*, 2023 Ark. App. 536, 679 S.W.3d 450. Even in termination cases, this court will not address issues raised for the first time on appeal. *Id.* Because Huggler failed to argue the least restrictive relative-placement argument to the circuit court, her argument is not preserved for our review. *See Nelson v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 444, 699 S.W.3d 393; *Barnoskie v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 323, 689 S.W.3d 470 (noting that review is precluded where the appellant did not make the less restrictive relative-placement argument to the circuit court at the termination hearing).

But even had Huggler preserved the issue for appeal, it would still fail to provide a path to reversal of the termination of her parental rights. Specifically, to make a least-restrictive-placement argument on appeal, there must be, at a minimum, an appropriate and approved relative in the picture to provide custody and care for the child. Here, the undisputed evidence presented at trial revealed no long-term relative placement available to care for MC. Family Service Worker Andrea Williams testified that, although the maternal grandfather stated he wanted to be a part of MC's life and at one point stated he wanted to be a placement for her, he later withdrew that request, informing the Department at a family team meeting that he did not believe he was fit, medically or physically, to care for MC given her age. Likewise, Williams testified that MC's maternal great aunt and uncle, who were the current foster parents, had informed the Department that, while they also wanted to be a part of MC's life, they could not take on that role long term. All three of the maternal relatives at issue were present at the termination hearing, but none of them testified or

intervened to prevent the termination. Given MC's need for permanency, the court did not clearly err in finding termination was in MC's best interest.

Moreover, as to her claim that there would be no potential harm in returning MC to her, the record is replete with instances in which Huggler prioritized her relationship with Duncombe over her reunification with MC. While she claimed to have ended their relationship, the court was not required to find her testimony credible, especially given her past attempts to conceal her continued association with him. We defer to the circuit court because of its superior opportunity to observe the parties and judge the credibility of the witnesses. *McGaugh*, *supra.*

Finally, the Department, in its brief, suggests that Huggler also challenged the statutory grounds for termination. It is unclear to us whether she actually did because her arguments seem to address whether she had remedied the conditions causing removal or had manifested an incapacity or indifference to remedy those issues or factors arising after removal. Those factors also relate to whether termination was in MC's best interest or whether she should be allowed more time to improve her circumstances. However, to the extent she challenges statutory grounds, the Department is correct that she failed to challenge the aggravated-circumstances ground—namely, that there is little likelihood that services would result in successful reunification. Because Huggler failed to challenge an independent ground for termination of her parental rights, we must affirm on this point. *Phillips v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 565, at 10, 567 S.W.3d 502, 508 ("When an appellant

15

fails to attack the circuit court's independent, alternative basis for its ruling, we will not reverse.").

For the foregoing reasons, we affirm the termination of Huggler's parental rights.

## B. Duncombe

Like Huggler, Duncombe also challenges that circuit court's best-interest finding. He argues that the court cannot terminate his parental rights while also intending to maintain and foster a relationship status with a biological relative since termination completely severs the ties between a child and the child's biological family. He asserts that, if the circuit court deems it important to maintain those familial ties, it cannot then be in the child's best interest to sever those ties.

However, Duncombe, like Huggler, failed to make this argument below. In fact, Duncombe was absent from the hearing, and his counsel presented no evidence or defense to the termination and made no closing argument on his behalf. Thus, these arguments are clearly being made for the first time on appeal. As such, his arguments have not been preserved for our review. *See Nelson*, *supra*; *Barlogie*, *supra*.

Accordingly, we also affirm the termination of Duncombe's parental rights.

## IV. *Conclusion*

For the foregoing reasons, we affirm the termination as to both Huggler and Duncombe.

Affirmed.

GLADWIN and WOOD, JJ., agree.

16

*Digby Law Firm*, by: *Mathew R. Ingle*, for separate appellant Bonney Huggler.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for separate appellant David Duncombe.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.